# In the United States Court of Federal Claims

No. 10-682C
(Filed January 7, 2011)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | |
| **ACROW CORPORATION OF AMERICA,** | * | Post-award bid protest; 28 U.S.C. |
| | * | § 1491(b)(1) (2006); responsibility |
| Plaintiff, | * | determination, 48 C.F.R. (FAR) |
| | * | § 9.103 (2010). |
| v. | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| Defendant, | * | |
| | * | |
| and | * | |
| | * | |
| **MABEY BRIDGE & SHORE, INC.,** | * | |
| | * | |
| Defendant-Intervenor. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |

Thomas A. Coulter, Richmond, VA, for plaintiff. Nicole Hardin Brakstad, LeClair Ryan, PC, of counsel.

Lartease M. Tiffith, Washington, DC, with whom was Assistant Attorney General Tony West, for defendant. Debra J. Talley, Associate Command Counsel, Army Materiel Command, Redstone Arsenal, AL, of counsel.

Elizabeth W. Newsom, Washington, DC, for defendant-intervenor. David Z. Bodenheimer and Puja Satiani, Crowell & Moring, LLP, of counsel.

## MEMORANDUM OPINION AND ORDER 1/

_____

1/ This opinion originally was filed under seal on December 17, 2010. The parties were requested to notify the court of any redactions. Defendant's redactions are denoted by brackets. Plaintiff did not request any redactions.

**MILLER**, Judge.

This matter is before the court after argument on the parties' cross-motions for judgment on the administrative record.  The narrow issues before the court are whether the contract awardee made a material misrepresentation to the contracting officer that she relied on so as to render her responsibility determination arbitrary and capricious, or whether the contracting officer's failure to consider the full text of a proposed counterclaim that particularized information that she reviewed generally in other documents rendered her decision arbitrary and capricious.

## FACTS

1.  <u>History of the procurement</u>

Plaintiff protests the award of Solicitation No. W56HZV-09-R-0480 (the "Solicitation") to defendant-intervenor Mabey Bridge & Shore, Inc. ("MBSI"), on the ground that the United States Army TACOM Life Cycle Management Command ("TACOM") improperly determined that MBSI was a responsible offeror.  The Solicitation included a firm, fixed-price five-year requirements contract, with two one-year options, to build a Line of Communication Bridge ("LOCB") system that transports ground forces in the U.S. Army across dry and wet "gaps."  Admin. R. ("AR") filed Oct. 19, 2010, at 49.  LOCB systems "ensure support forces are able to move freely and without delay throughout a given theater of operation."  Compl. filed Oct. 8, 2010, ¶ 14.

The Solicitation articulated the method of determining which proposal provided the "best value," stating, in relevant part:

> [T]he Government will evaluate the following factors: Experience, Price, Technical and Small Business Participation.  Experience is equal in importance to Price.  Price is more important than Technical.  Technical is more important than Small Business Participation.  The non-price factors when combined are more important than Price.
>
> . . . .
>
> (a)      [The Government will] award a contract to the offeror that:
>
> (1) . . . provides the best value to the Government if factors in addition to price are identified elsewhere in this solicitation, <u>and</u>

. . . .

(3) meets all the responsibility criteria at FAR 9.104.

AR at 161-62. The Solicitation further mandated that, "[p]er FAR 9.103, contracts will be placed only with the Contractors that the Contracting Officer determines to be responsible. Prospective Offerors . . . must be able to demonstrate that they meet standards of responsibility set forth in FAR 9.104." AR at 161. 48 C.F.R. (FAR) § 9.104-1 (2010), lists seven aspects of "responsibility" that a contracting officer should consider in coming to a responsibility determination, among which is the requirement that "a prospective contractor must . . . (d) [h]ave a satisfactory record of integrity and business ethics (for example, see Subpart 42.15)." Id.

In 2009 TACOM awarded plaintiff an Operational Needs Statement ("ONS") contract to make similar, although not identical, bridge systems. See Declaration of William T. Killeen, Nov. 29, 2010, ¶3; see also Declaration of David W. Marck, Dec. 2, 2010, ¶ 2 ("Marck Decl. II") (noting that while there are similarities between plaintiff's ONS contract and disputed procurement, there are also several differences). Contract performance on the ONS contract began March 17, 2009, Killeen Decl. ¶ 15, and is set to expire March 16, 2012, Pl.'s Br. filed Oct. 29, 2010, at 3.

TACOM notified plaintiff of the Solicitation on December 2, 2009, and plaintiff submitted its proposal on January 18, 2010. MBSI, plaintiff's competitor in the bridge-supply industry, was the only other offeror to submit a proposal. MBSI is part of a group of bridging manufacturing and supply companies known as the Mabey Group of companies based the United Kingdom. Prior to October 1, 2009, a now-defunct company called Mabey & Johnson Ltd. ("M&J"), was the primary bridge "manufacturer of the Mabey Logistics Support Bridge." AR at 545. MBSI is, and M&J was, a division of Mabey Engineering (Holdings) Ltd. and ultimately of its parent company, Mabey Holdings Ltd., all of which are part of the Mabey Group; however, in October 2009, Mabey Bridge Ltd. ("MBL") purchased M&J's assets and contracts. M&J now exists as a defunct subdivision of MBL, maintaining, as of March 2, 2010, only "some residual trade." AR at 579. MBL is now MBSI's substantial subcontractor and prospective manufacturer and subcontractor under MBSI's proposal. MBSI has "supplied Line of Communication Bridging worth $125 million" since 2003. AR at 582.

M&J had been the source of recent international controversy initiated by a draft counterclaim making allegations about M&J by former Mabey manager Jonathan Danos. Mr. Danos was engaged in negotiating commissions with M&J's agents in various countries in Africa and South America. See AR at 3622 (the "Danos counterclaim"). The Danos

3

counterclaim arose from a proceeding instigated by M&J on January 11, 2007, against Mr. Danos; "M&J claimed that Mr. Danos had acted in breach of his contract of employment and his fiduciary duty by agreeing to pay an inflated commission figure to the Jamaican agent in order that he and the agent could secretly profit at M&J's expense . . . ." AR at 3408 (Prosecution Opening Note in UK litigation against M&J (the "Prosecution Opening Note")). 2/ However, Mr. Danos countered in a draft amended defense and counterclaim that it was "'common practice' for M&J to pay government officials in order to secure contracts." Id. Although it appears the litigation was settled, the draft amended defense and counterclaim was sent to M&J's attorneys and ultimately led M&J to conduct a widespread investigation and to voluntarily report itself to the Serious Fraud Office of the United Kingdom (the "SFO"). AR at 3409.

M&J pled guilty on September 25, 2009, for corrupt practices for contracts in Jamaica and Ghana, including payments from 1993 through 2001 of bribes in the form of large commissions, and for breaching a United Nations embargo on trade with Iraq from 2001 through 2002. The charges were brought by the SFO, which outlined its case and terms of a settlement in the Prosecution Opening Note. The SFO alleged that M&J routinely paid agents commissions that ranged from contract to contract, but that historically included fees of five to fifteen percent. AR at 3404. In particular, in Jamaica and Ghana, M&J was aware

---

2/   When the court refers to the "Prosecution Opening Note," the referent is the document contained in the administrative record at 3403-46 that discusses the bribery practices for which M&J was prosecuted. This is the opening note from the charges brought by the Serious Fraud Office of the United Kingdom investigation against M&J. Two prosecution opening notes appear in the administrative record for the two types of conduct to which M&J pled guilty: overseas corruption in Jamaica and Ghana and breach of United Nations sanctions in the Iraq oil-for-food program. Although plaintiff contends that "these documents were not in the contract file, as required by FAR 9-105(2)(b)," Pl.'s Br. filed Nov. 29, 2010, at 2, defendant substantiates that the contracting officer reviewed both documents before writing her Memorandum for Record on June 8, 2010, Def.'s Br. filed Dec. 3, 2010, at 7. Defendant points to page 778 of the administrative record to support its contention. Id. This document consists of an online article reporting on M&J's September 25, 2009 sentencing hearing and attaches the prosecution's opening notes for both charges. See AR at 778. Although the contracting officer was unable "to retrieve the files from the website because the links had expired," a hard copy was provided to the GAO and this court. Def.'s Br. filed Dec. 3, 2010, Ex. B. The court agrees with defendant that "based upon the dates stamped on the website screen shot the document had been viewed no later than February 10, 2010, months before the filing of the Memorandum of Responsibility . . . ." Id. (citation omitted).

that "its agents were involved in corrupt relationships with public officials," and M&J accepted that it agreed with these agents to bribe public servants with money from the agent's commission payments.  AR at 3405.  To that end, the SFO charged that M&J "employed known bribers as agents for commercial gain from the outset."  Id.  The SFO asserted that it is "beyond reasonable argument that unless properly monitored and controlled, the payment of commissions is a corruption 'red flag' exposing the company to risk.  What it may provide is a convenient smokescreen to deny corporate or individual knowledge of arrangements conducted overseas."  Id.

The SFO limited its pursuit of indictment charges against M&J to contracts in Jamaica and Ghana, even though M&J disclosed corrupt dealings in Madagascar, Angola, Mozambique, and Bangladesh.  AR at 3407.  It is noteworthy, however, that the SFO characterized M&J as engaged in "widespread historical corrupt practices."  AR at 3412. Because M&J accepted that, "in paying agents large commissions there was a risk that unknown proportions of those payments might be passed on to public servants as bribes," the SFO made the following statement: "in countries with a similar risk of corruption where M&J operated, such a system must have given rise to an identical risk."  AR at 3406.  The prosecution concluded that "there was a practice of corrupt activity within [M&J] before 2002" that was historically "pervasive" even though the SFO did not prosecute every manifested instance.  See AR at 3442 (emphasis added).  This limitation appears to have been fueled by the SFO's desire to encourage companies to self-report any discovered fraud or corruption "with proposals about the changes and monitoring needed in the future."  AR at 3407-08.  The SFO was prepared "to discuss with them the pleas or other resolution that the SFO considers to be in the public interest."  AR at 3408.

The second noteworthy aspect of the Prosecution Opening Note is the SFO's characterization of M&J's ownership structure.  M&J is an affiliate of a group of companies owned by the Mabey family.  AR at 3410.  As described in the Prosecution Opening Note:

> The majority shareholder of the Mabey Group is Mabey Family Trustees Ltd., which owns the majority of the shares in Mabey Holdings Ltd., which in turn owns Mabey Engineering (Holdings) Ltd., a subsidiary of which is M&J.

Id.  Although David Mabey resigned as a director of M&J and Mabey Holdings Ltd. and he no longer has an executive role, the SFO found: "The reality of the ownership structure of M&J is that the Mabey family in general, and David Mabey in particular, have at all times been in exclusive control of the affairs of M&J."  AR at 3411.  As shareholders, David Mabey and his family retained authority to appoint and remove M&J directors.  Bevil Mabey, David Mabey's father, is the only other family member to have taken an executive role prior to their resignation.  AR at 3410, 3403 (stating Bevil Mabey resigned as a director in 2007).

Finally, the SFO favorably recited M&J's efforts to change policies, add new leadership, and impose monitoring mechanisms to ensure future compliance. The SFO noted that M&J replaced its board of directors "and is changing and continues to review its business practices. It is, to a notable extent, no longer the company that committed these crimes." AR at 3407; see also AR at 3410 ("The SFO also [recognizes] that since the commencement of the investigation[,] M&J has taken certain remediation steps."). The SFO attributed the speed with which the SFO was able to conduct its investigation to the "considerable level of co-operation" it received from M&J's solicitors. AR at 3409. M&J "introduced new ethical procedures and agreed to the appointment of an external monitor." AR at 3410.

### 2. The contracting officer's responsibility determination

In a letter dated March 17, 2010, to MBSI, the contracting officer stated that she was "aware that [M&J] pleaded guilty in 2009 to corruption offenses and was sentenced on 25 September 2009 for corrupt practices." AR at 575. Because MBL had subsumed M&J's contracts in a company reorganization, AR at 584, the contracting officer decided under FAR 9.104-3(c), -4(b), to make a responsibility determination with regard to MBSI and MBSI's "affiliate and prospective subcontractor," MBL, AR at 576. In light of the SFO's prosecution and "investigations undertaken concerning similar matters," she invited MBSI to provide her with evidence that both companies had "a satisfactory record of integrity and business ethics," as defined in FAR 9.104-1(d). Id. The contracting officer suggested that MBSI "take care to ensure [its] response [was] truly adequate to support a positive conclusion," including, for example, "corrective action plans." Id. (emphasis added). MBSI and MBL submitted separate responses.

In its March 26, 2010 response, MBSI denied any involvement, stating that "[i]t is important to note that MBSI was never party to, and has never been alleged to have been a party to, the practices for which M&J has been prosecuted." AR at 582 (emphasis added). MBSI further disclosed that the "individuals who were involved in the wrongdoing at M&J are being prosecuted," including Charles Forsyth, M&J's Managing Director and MBSI's Chairman from 1989 to 2008, who was removed and "has no present role in the management of MBL, MBSI or their affiliates." AR at 583. MBSI broadly asserted that "no allegations have been made which would suggest that any of Mr. Forsyth's activities at M&J affected MBSI. Neither MBSI nor any of its current officers and directors has been charged with any illegal activity." Id. (emphasis added).

In addition, MBSI touted its forthright attitude and willingness to meet with the contracting officer to discuss the M&J prosecution, proclaiming that "we are pleased now to be given the opportunity to explain that MBSI played no part in the events that led to the

prosecution of M&J." AR at 582. Further, MBSI pointed to "the record of new management and enhanced compliance procedures, monitoring and training" to support a "positive determination of responsibility." AR at 583.

The response from MBL set forth a more detailed explanation of the corrective actions that MBL undertook to distance itself from the historically corrupt practices of M&J. MBL explained that, "as part of a wider re-organization of the Mabey Group," MBL acquired M&J and another affiliate, Fairfield-Mabey Ltd. AR at 584. Two former directors, Mr. Forsyth and David Mabey, along with a senior manager that was not named, are being prosecuted. Mr. Mabey retains a small interest in a parent company and in the Mabey Group, but has "given a written undertaking that he will not seek to influence the affairs of [M&J] or the Mabey Group." AR at 585. The agreement is "to remain in full force until, at the earliest, 7th August 2012." Id. MBL acknowledged that the Danos counterclaim was the catalyst to M&J's internal investigation and voluntary disclosure of historical corrupt practices. Id. ("In early 2008 in the course of High Court proceedings in the UK by [M&J] against an ex-employee, the ex-employee made allegations that corrupt payments had been made by [M&J]."). M&J then undertook corrective measures—"five of [M&J's] existing directors stood down," M&J instructed "its external lawyers to undertake a broad investigation of its contracts," and "an independent monitor" was appointed with the approval of the SFO. AR at 586-87. The independent monitoring agreement went into effect on August 12, 2009, and continues until August 12, 2012, AR at 546, and MBL was added to the monitoring agreement, AR at 547.

Based on these responses, the contracting officer explained in her Memorandum for Record, dated June 8, 2010, how MBSI had addressed the principal concerns set forth in her March 17, 2010 letter. The contracting officer stated that her "extensive internet research did not identify any incidents, other than [M&J's sentence in the UK for corrupt practices and for breaching the UN embargo] that [she] needed to consider. Based on having knowledge of these matters," she issued her March 17, 2010 request for information. AR at 545. In this way, the contracting officer appeared to narrow her inquiry exclusively to the events surrounding the SFO's prosecution of M&J, and not "investigations undertaken concerning similar matters," as she requested on March 17, 2010. See AR at 576.

The contracting officer's Memorandum for Record acknowledged that M&J began its investigation "upon an allegation made by an ex-employee that the company had made corrupt payments"—the Danos counterclaim. AR at 546. She then recited the steps taken by M&J to rectify its past corruption, which included requiring five members of its board of directors to step down, pleading guilty to payments of $1.5 million to foreign officials to obtain contracts valued at $100 million, making reparation payments of $10 million, and entering an agreement with Global Infrastructure Anti-corruption Centre Limited to act as

an independent monitor.  AR at 546.  She stated that a "key point[] from the response [from MBSI]" that she received was that "MBSI was never a party to and <u>has</u> never been alleged to be a party to <u>the events that led to the prosecution of M&J</u>."  Id. (emphasis added). Although the M&J fraud litigation was of concern to the contracting officer, her concerns were sufficiently assuaged by the responses that 1) M&J, now MBL, had taken corrective actions to ensure the corruption did not repeat itself, and 2) MBSI was not involved in the "events that led to the prosecution of M&J."

###### 3.  <u>Allegations in the Danos counterclaim</u>

The pertinence of the Danos counterclaim in this bid protest is that plaintiff contends that the contracting officer should have retrieved it in her "extensive internet search" or read it as a hyperlink in one of the newspaper articles that she listed in her computer log as having reviewed.  The court admitted the Danos counterclaim as part of the administrative record. Actually, it is a classic document offered in aid of litigation—plaintiff argues that it should have been considered.  It is true that the contracting officer knew of its existence and general import.  After all, it prompted not only the SFO investigation, but she mentioned it in her Memorandum of Record.  AR at 546.  Plaintiff would charge the contracting officer with its entire contents, including specific mention of MBSI.  If she had read the entire document, plaintiff argues, the contracting officer either would have found MBSI tarnished by being implicated in the entire fraudulent business practices of M&J or would have realized that MBSI's response was evasive and incomplete.  As will be discussed, the court rules that the Danos counterclaim is not part of the information that the contracting officer reviewed or should have reviewed.  The Prosecution Opening Note put her on notice that M&J and its affiliates were suspect.

The Danos counterclaim, the catalyst of the SFO prosecution of M&J, generally recounts Mr. Danos's involvement in negotiating contracts in several countries—particularly the commission agreements referenced in the Prosecution Opening Note.  The counterclaim discusses, for example, Mr. Danos's involvement in the commission agreements with foreign diplomats in Jamaica, stating "[T]he commission paid on these contracts . . . was at least 12.5% of the value of the goods supplied."  AR at 3622.  The Prosecution Opening Note explains that payments to Jamaican officials were made from November 20, 1993 to October 30, 2001.  AR at 3414.  "In 2002 [Mabey]—evidently aware of the ramifications of sections 108 and 109 of the Anti-Terrorism, Crime and Security Act  2001 – introduced new anti-corruption policies and procedures for the conduct of its business."  AR at 3411 (Prosecution Opening Note).  For example, an "Export Committee" was created to ensure "that no corrupt payments were being made," AR at 3623; or, rather, to ensure the technical compliance with the law.  Specifically, the Danos counterclaim asserts that Mabey took advice from former counsel to the Export-Import Bank (the "Ex-Im Bank") that "commissions over 5% would

be considered unreasonable (i.e. that Ex-Im would suspect from commission rates over 5% that there had been 'bribery or inducements in connection with the contract.')." AR at 3638-39.  To avoid suspicion, the Export Committee split a "commission of 8.5%" into "5% commission with a further 3.5% as payment for 'services.'" AR at 3623.  Mr. Forsyth, in particular, was involved in negotiating the commission-splitting arrangement in Jamaica.  AR at 3623 (attributing order to split the commission agreement to Mr. Forsyth, who "did not give any explanation as to why it was thought necessary to attribute an element of the commission to 'services'").

The Danos counterclaim alleges that Mabey personnel attempted to employ this type of fee-splitting arrangement in negotiating a particular agreement in the Dominican Republic that involved MBSI and MBSI's President and director, Geoffrey Booth. 3/   The counterclaim alleges that Mabey companies had contracts in the Dominican Republic that paid extravagant commissions to a man named "Mr. Pagan" for years.  A total of six projects were initiated—paying initially a fifteen percent commission, and then a twenty percent commission thereafter.  AR at 3634-35.  Mr. Pagan routinely would receive a "confirmation letter" confirming his twenty-percent commission for each project.  The counterclaim implies that Mr. Forsyth, as well as Mr. Danos, was involved in the negotiations of these contracts.  However, the relationship broke down in 2001, in what the Danos counterclaim terms the "abortive 'DR Ex-Im Project.'" AR at 3638.

The Danos counterclaim asserts that Mr. Pagan was initially to be paid his usual twenty-percent commission, but that Mabey attempted to "re-label his remuneration, i.e. purportedly to distinguish between 'commission' and 'services.'" AR at 3636.  However, according to Mr. Danos, "both he and Mabey knew he was not providing any 'services' over and above finding and securing contracts as he had done for the past 15 or so years." Id. Negotiations continued, and on March 14, 2003, Mr. Forsyth, who was involved in negotiating this deal, sent Mr. Danos an e-mail attaching three documents, including the "'Mabey Bridge & Shore/Pagan Revised Documentation' (referred to in the email as an 'Outline of the arrangements between CTP and MBSI,'" to discuss with Mr. Pagan.  AR at

_____

3/  "Geoff Booth" is introduced in the exhibits as the President and Director of MBSI. See AR at 3396 (letter from MBSI, on MBSI letterhead, to plaintiff dated June 15, 2009, in which Geoff Booth signs his name as "President"); AR at 3399-40 (letter from MBSI, on MBSI letterhead, to plaintiff dated May 8, 2009, in which Geoff Booth signs his name as "President").  MBSI now, without explanation, contends that "Mr. Booth is not MBSI's President," MBSI's Br. filed Nov. 12, 2010, at 29 n.8, although a document appearing to be a Mabey company organizational chart submitted by MBSI to the contracting officer dated March 2, 2010, lists "G.Booth" as an officer of MBSI.  See AR at 579.

3640.  Mr. Pagan did not want to split the payment between "commission" and "services," and negotiations continued.  AR at 3640.  In the minutes of an April 15, 2003 meeting, Mr. Forsyth circulated a draft agreement, and "after lengthy discussion it was agreed that while there was general agreement in principle on how the service agreement should be structured there was some divergence of opinion on the details and item coverage. . . . GWB (i.e.[,] Mr. Geoffrey Booth, a director of MBSI) to respond to RCEF (i.e.[,] Mr. Forsyth) within 48 hours."  AR at 3640.  The counterclaim outlines further negotiations by which Mabey employees and Mabey's attorneys attempted to negotiate a deal that included a service agreement for services the company maintained that Mr. Pagan always had performed.  However, the Danos counterclaim throughout alleges that these were fictitious services and that no services were performed under the first five contracts.  AR at 3642.  For this reason, when David Mabey met with Mr. Pagan on July 24, 2003, a contract was not reached and the parties parted ways.  AR at 3642-43.

4.  <u>Award of contract and subsequent proceedings</u>

TACOM notified plaintiff via e-mail on June 8, 2010, that the award would go to MBSI.  At the June 16, 2010 oral debriefing requested by plaintiff, TACOM reported:  "As part of [the] responsibility determination process, particular attention was placed on the integrity and business ethics portion of the standards," especially with regard to the M&J fraud litigation.  <u>4</u>/ AR at 3349.  However, plaintiff and MBSI were rated equivalently in each of the subject areas evaluated under the Solicitation except in price—Acrow submitted a proposal to complete the project for [deleted] and MBSI's bid was for [deleted].  AR at 3324.  MBSI ultimately received the award because "[b]oth offerors are essentially equal in Experience, Technical, and Small Business Participation, but the MBSI proposal is significantly lower in Total Evaluated Price than that of Acrow. . . . The MBSI proposal is reasonable, realistic and affordable; and MBSI has been determined to be a responsible contractor."  AR at 3365 (Memorandum of Source Selection Decision).

Plaintiff protested the award before the Government Accountability Office (the "GAO"), but was ultimately unsuccessful.  The GAO determined that "[t]he record . . . shows . . . that the contracting officer was aware of, and considered, available information

---

<u>4</u>/  A power-point printout of this debriefing was provided post-award.  It is part of the administrative record because neither party sought to exclude it.  The court consults this material only insofar as it recites public statements by the contracting officer relating to her decisionmaking process.  However, her June 8, 2010 Memorandum of Source Selection Decision, which explained the basis for her responsibility determination, makes the same point.  <u>See</u> AR at 3365.

concerning M&J's 2009 conviction for corrupt practices and MBSI's and MBL's relationship to M&J."  AR at 3482.

On October 8, 2010, plaintiff filed the pending protest before the United States Court of Federal Claims.  After the court consolidated plaintiff's Motion for Preliminary Injunction with the parties' cross-motions for judgment on the administrative record, see Order entered October 14, 2010, and adopted the parties' agreed-upon briefing schedule, defendant filed the administrative record on October 19, 2010.  Plaintiff moved for judgment on the administrative record on October 29, 2010; defendant's and defendant-intervenor's cross-motions were filed on November 15, 2010, and November 12, 2010 respectively; plaintiff filed its response and reply on November 29, 2010; and defendant and defendant-intervenor replied on December 3, 2010.  Argument was held on December 7, 2010.

**DISCUSSION**

1. Standard of review

The Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (codified at 28 U.S.C. § 1491(b)) (the "ADRA"), amended the Tucker Act, 28 U.S.C. § 1491(b)(1) (2006), granting the United States Court of Federal Claims jurisdiction over bid protests.  See Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1243 (Fed. Cir. 2010); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001) ("Domenico Garufi").  The ADRA's standard of review for agency procurement decisions adopted the standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 (2006) (the "APA").  See 28 U.S.C. § 1491(b)(4).  The court has authority under the APA to set aside only an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see PGBA, LLC v. United States, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004) (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions); see also Domenico Garufi, 238 F.3d at 1332-33 (making applicable the standards applied in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and its progeny to bid protests).  However, establishing that an agency violated the APA standard of review does not entitle a protestor to relief; the error also must be prejudicial.  Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (clarifying that, in addition to significant error in procurement process, plaintiff must show error was prejudicial).

Accordingly, the Federal Circuit applies a two-step analysis.  First, the court must determine whether the Government acted without a rational basis (whether the action was arbitrary or capricious), or whether the Government acted contrary to law (whether

11

government action constituted a prejudicial violation of an applicable procurement regulation).  See Domenico Garufi, 238 F.3d at 1332.  In either case a plaintiff bears the heavy burden of proving a lack of rational basis or a violation of the law.  Id. at 1333.  Second, if the government action lacked a rational basis, a factual inquiry must be conducted to determine whether the protester was prejudiced by the conduct.  See Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

A rational basis requires "the contracting agency [to] provide[] a coherent and reasonable explanation of its exercise of discretion."  Domenico Garufi, 238 F.3d at 1382 (citation omitted) (internal quotation marks omitted).  The court's role in a bid protest, including ascertaining the existence of a rational basis, is not to substitute its judgment for the agency; indeed, the agency generally is accorded wide discretion in evaluating bids.  See Citizens to Preserve Overton Park, Inc., v. Volpe, 401 U.S. 402, 416 (1971) (stating a court should not "substitute its judgment for that of the agency"), overruled on other grounds by California v. Sanders, 430 U.S. 99 (1977); CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008); Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994); see also Camp v. Pitts, 411 U.S. 138, 142-43 (1973) (holding that courts should review agency record to determine if agency's decision is supported by a rational basis).  Under the "highly deferential rational basis review," Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting CHE Consulting, 552 F.3d at 1354) (internal quotation marks omitted), the court "must sustain an agency action unless the action does not 'evince[] rational reasoning and consideration of relevant factors,'" id. (alteration in original) (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000)).  The court should afford particular deference to an agency decision regarding contracts "awarded to the bidder or bidders that will provide the agency with the best value," Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1355 (Fed. Cir. 2004), and in responsibility determinations, which "are largely a matter of judgment," Bender Shipbuilding & Repair Co. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002) (citation omitted) (internal quotation marks omitted).

2.  Burden of proof

The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1.  This rule provides a procedure allowing the court to expedite a trial by using a "paper record" to conduct fact finding.  Bannum, 404 F.3d at 1356.  Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record.  Id. at 1355-56.  The parties are restricted to the agency record and any

supplementation consistent with RCFC 52.1. 5/ Findings of fact made by the court are consistent with those that would be made during trial. Id. at 1357.

Adoption of the APA substantive standard of review did not change the court's standard for granting injunctive relief. See PGBA, 389 F.3d at 1224-28 (clarifying that ADRA incorporates arbitrary and capricious standard of APA to review procurement decisions, but did not change court's discretion in granting remedy of injunctive relief). The Federal Circuit requires a protestor to establish that "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009).

### 3. Contracting officer's authority

FAR 9.103 mandates that "contracts shall be awarded to[] responsible prospective contractors only" and charges a contracting officer to make an "affirmative determination of responsibility," FAR 9.103(a), (b). Part of the determination is ensuring that a prospective contractor has "a satisfactory record of integrity and business ethics." FAR 9.104-1(d). A responsibility determination may include parties beyond the immediate prospective contractor, including a "prospective subcontractor" when the subcontractor's responsibility "may affect the Government's determination of the prospective prime contractor's responsibility," FAR 9.104-4(a), and also an "affiliate's past performance and integrity when they may adversely affect the prospective contractor's responsibility," FAR 9.104-3(c). Regardless of which entities are included, "[a] prospective contractor must affirmatively demonstrate its responsibility, including, when necessary, the responsibility of its proposed subcontractors." FAR 9.103(c). "In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility." FAR 9.103(b).

--------------------------------------------

5/ The parties filed various motions and briefs requesting record supplementation prior to completion of the parties' briefing on their cross-motions for judgment on the administrative record. The court issued orders on November 5, 2010, and November 12, 2010, addressing the requests for record supplementation. Subsequently, plaintiff filed a second motion to supplement the administrative record on December 3, 2010. The court addresses this motion and clarified and summarized the two previous orders on this matter in its order on supplementation separately issued this date.

The FAR equips contracting officers with the ability to "obtain information sufficient" to make a responsibility determination.  FAR 9.105-1(a).  These regulations establish a procedure under which the contracting officer has broad discretion and authority in making a responsibility decision and identifying the best awardee for a particular contract—not necessarily the lowest bidder.  John C. Grimberg Co. v. United States, 185 F.3d 1297, 1303 (Fed. Cir. 1999) (holding contracting officer's purview to include "what, and how much, information he needs"); Bender Shipbuilding, 297 F.3d at 1362 ("Contracting officers are generally given wide discretion in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." (quoting Domenico Garufi, 238 F.3d at 1334-35) (internal quotation marks omitted)); see also FAR 9.103(c) (recognizing that "award of a contract to a supplier based on the lowest evaluated price can be false economy").

4.  Plaintiff's challenge to the award

Plaintiff protests the award on the ground that the contracting officer should not have determined MBSI and MBL responsible because they lack "a satisfactory record of integrity and business ethics."  FAR 9.104-1(d).  Plaintiff asserts that there is an "absence of information clearly indicating that the prospective contractor is responsible," FAR 9.103(b), so that the contracting officer should have found MBSI and MBL non-responsible.

Plaintiff's attack on the contracting officer's determination that MBSI and MBL were responsible offerors has two factual predicates.  The first set of facts arises out of the M&J guilty plea and the SFO investigation that led to that guilty plea.  Although TACOM's debriefing stressed that "particular attention was placed [by the contracting officer] on the integrity and business ethics portion of the standards" because of the M&J fraud litigation, AR at 3349, plaintiff asserts that the contracting officer failed to appreciate fully the scope of M&J and its affiliates' corruption.  The SFO investigation focused on bribery allegations in Jamaica and Ghana, but M&J's corruption expanded to many countries, including the Phillipines; Papau, New Guinea; Costa Rica; Panama; and the Dominican Republic.  Plaintiff charges that the scope of corruption is attributable directly to MBSI because of MBSI's close affiliation to M&J.  Further, plaintiff asserts that MBSI was involved directly in bribery activities, as recounted in the Danos counterclaim and in contradiction to statements made by MBSI.  Plaintiff alleges that the contracting officer 1) should have been required to review the Danos counterclaim, Pl.'s Br. filed Oct. 29, 2010, at 18, and 2) should have been prohibited from determining MBSI and MBL responsible because the allegations involving MBSI in the Danos counterclaim demonstrate that MBSI made an "indisputably false" statement to the contracting officer upon which she relied, see Pl.'s Br. filed Nov. 29, 2010, at 3, 8-10.  Defendant and MBSI dispute all the above contentions, and their positions are set forth below.

14

Plaintiff titles the events that comprise the second factual predicate upon which plaintiff basis its arguments as "MBSI's recent [corporate] espionage." See Pl.'s Br. filed Oct. 29, 2010, at 8. Plaintiff alleges that MBSI sent an employee to plaintiff's warehouse, under the guise of attempting to visit a former co-worker, when MBSI knew the Army was conducting tests on plaintiff's bridges. Id. Plaintiff also alleges that MBSI chartered a plane that flew over the testing site several times. Id. Plaintiff asserts that the contracting officer failed to consider or fully appreciate these incidents, as she failed to mention them in her Memorandum for Record, which plaintiff contends, would have rendered MBSI non-responsible. Id. at 31. 6/

---

6/ Plaintiff further charges that, by failing to properly consider both sets of facts, the contracting officer violated her duty of good faith and fair dealing, which justifies injunctive relief. Pl.'s Br. filed. Oct. 29, 2010, at 35-38. Specifically, plaintiff asserts that it is entitled to "contract award, resolicitation of contract, bid preparation and proposal costs, and/or attorneys' fees." Compl. ¶¶ 127, 132. The alleged harm, however, was caused by the contracting officer's failure to "disqualify MBSI as a responsible offeror," the same action for which plaintiff contends it is entitled to injunctive relief. Id. ¶ 124.

To the extent that plaintiff makes its arguments under 28 U.S.C. § 1491(b), the court will address the merits of plaintiff's claims infra. MBSI astutely points out that plaintiff cannot pursue an implied-in-fact contract remedy under 28 U.S.C. § 1491(a) because it is pursuing a bid protest remedy. See MBSI's Br. filed Nov. 12, 2010, at 41. This undersigned judge has long held the opinion that the amendment of § 1491(b)(1), "obviates the need for the implied-contractual theory," and that bid protest claims should be brought under § 1491(b). See Lion Raisins, Inc. v. United States, 52 Fed. Cl. 115, 120 (2002). The Federal Circuit recently affirmed in Resource Conservation, 597 F.3d 1238, that, while § 1491(a) continues to provide a basis for nonprocurement cases, a protestor cannot bring an implied-in-fact contract claim under 28 U.S.C. § 1491(a) if it seeks relief under 28 U.S.C. § 1491(b)(1) because "Congress intended the 1491(b)(1) jurisdiction to be exclusive where § 1491(b)(1) provided a remedy (in procurement cases)." Res. Conservation, 597 F.3d at 1246; see also Metro. Van & Storage, Inc. v. United States, 92 Fed. Cl. 232, 249 n.7 (2010). Plaintiff seeks injunctive relief and "bid preparation costs," two remedies provided for under § 1491(b)(1), (2). ("To afford relief [under § 1491(b)(1)], the courts may award any relief that the court considers proper, including . . . injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2)). Accordingly, the remedies that plaintiff seeks are provided for in § 1491(b), which constitutes plaintiff's sole statutory basis for relief.

15

5. <u>Whether the contracting officer relied on a misrepresentation that would lead to</u>
   <u>a finding that her responsibility determination was arbitrary and capricious</u>

Plaintiff contends that the contracting officer's responsibility determination was arbitrary and capricious in that she relied on the misrepresentations made by MBSI in its March 26, 2010 letter. Pl.'s Br. filed Nov. 29, 2010, at 3. More specifically, plaintiff contends that MBSI's statement that the company "was never alleged to have been a party to the practices for which M&J was prosecuted," was misleading, given that the Danos counterclaim alleges that MBSI and Mr. Booth were involved in MBSI's negotiations with Mr. Pagan in the Dominican Republic. Id. at 3-4. Defendant and MBSI not only deny that the Danos counterclaim alleges that MBSI was involved in any bribery schemes, but they also deny that MBSI made any inaccurate statements to the contracting officer. See MBSI's Br. filed Nov. 12, 2010, at 31 ("MBSI told the truth.").

1) <u>Allegations relating to MBSI in the Danos counterclaim</u>

Plaintiff contends that the Danos counterclaim "alleges the involvement of MBSI and its current president [Mr. Booth] in a bribery effort in the Dominican Republic that is identical to the *modus operandi* of M&J in other countries, and involved MBSI's chairman, who was also the managing director of M&J." Pl.'s Br. filed Nov. 29, 2010, at 4. According to plaintiff, the Danos counterclaim implicates MBSI and Mr. Booth as participants in a scheme to split commission payments—"payments to allow its local agents to funnel money to local public officials in return for contract awards"—between a commission payment and payment for local services, "even though [they] knew the agent [they were paying] was providing no local services." Id. at 5-6. Defendant and MBSI demur. Both parties characterize the Danos counterclaim as evidence of an effort to "comply" with the anti-corruption laws and the reason the deal fell apart. See MBSI's Br. filed Nov. 12, 2010, at 30; Def.'s Br. filed Nov. 15, 2010, at 3-4 ("There is only a single, brief reference to MBSI in the Danos counterclaim which does not implicate MBSI in any wrongdoing. . . . Far from incriminating MBSI, this portion . . . indicates that with this particular transaction M&J and MBSI wanted the deal to comply with the United States Foreign Corrupt Practices Act [(the "FCPA")]."). MBSI points to a June 27, 2003 e-mail cited in the Danos counterclaim in which Mr. Danos states: M&J "'expressed a concern regarding the commission amount due to the new legislation,'" that resulted in the company being unable to provide Mr. Pagan "'with an agreement acceptable within M&J let alone Pagan.'" MBSI's Br. filed Nov. 12, 2010, at 30 (quoting Compl. Ex. 10 ¶ 71.9). MBSI notes that M&J's outside counsel drafted and reviewed the draft Dominican Republic agreements and counseled that both Mr. Pagan and M&J's interests should align in ensuring that "'all transactions fall clearly within the scope of the FCPA and other equivalent legislation.'" Id. (quoting Compl. Ex. 10 ¶ 71.11).

The court agrees with plaintiff, not in that MBSI was necessarily involved in a bribery scheme, but that the Danos counterclaim alleges that MBSI participated in an attempt to negotiate an agreement that purported to pay a smaller commission fee than actually would be paid.  The Danos counterclaim alleges that MBSI was involved in a contract that failed, but attempted to, perpetrate a fraud.  The counterclaim explicitly characterizes, for example, Mr. Forsyth's attempt to separate out "commission" from "services" that Mr. Pagan would perform as an attempt to "re-label his remuneration, i.e., purportedly to distinguish between 'commission' and 'services.'" AR at 3636.  The counterclaim further alleges that "both [Mr. Pagan] and Mabey knew that he was not providing any 'services' over and above finding and securing contracts as he had done for the past 15 or so years." Id.  This assertion stands in stark contrast to Mabey's assertions in a cover letter sent from Mr. Forsyth to Mr. Pagan, along with the MBSI draft agreements, that "commissions paid on previous contracts have always included payment for local services including various civil works and provision of local facilities for Mabey staff." AR at 3642.  It is not for the court to consider the legitimacy of the argument.  It is enough that the Danos counterclaim disclaims that legitimate premise as unfounded.  Id. (indicating that Mr. Forsyth knew that some of the words in the cover letter were untrue and that "[t]he 1st to 5th DR Projects were for the supply only of bridges, and there were no 'local services including various civil works and provision of local facilities for Mabey staff'").  The Danos counterclaim maintained that Mr. Pagan was paid an initial fifteen-percent commission on the first contract and twenty percent thereafter.  AR at 3634-35.

MBSI was involved in that the proposed Dominican Republic deal could have had Mr. Pagan sign an agreement with MBSI and that MBSI director Mr. Booth could have played a role.  AR at 3639 (alleging that Mr. Forsyth e-mailed Mr. Danos "Mabey Bridge Shore/Pagan Revised Documentation").  The proposed documentation included a five-percent commission agreement that would be coupled with various "'services' to bring the total remuneration to US $20 million." AR at 3640.  In total, the proposed agreement with MBSI was valued at $125 million—$100 million for the supply contract and $25 million for the "Local Civils Contract." Id.  Therefore, the "total remuneration" that Mr. Pagan was to receive equaled twenty percent of the $100 million Supply Contract.  The court agrees with plaintiff that "[i]t is simply incredible to suggest that Mr. Danos, amidst his scathing accusations against M&J, has included discussion of one project that shows M&J's efforts to comply with the law." Pl.'s Br. filed Nov. 29, 2010, at 7 (emphasis omitted).  A more plausible reading of the Danos counterclaim is that it alleges that the aborted Ex-Im deal was an attempt to structure an exorbitant commission payment so as not to draw the suspicion of the Ex-Im Bank.  Insisting that he did not provide any "services," Mr. Pagan refused to go through with the deal.

2)  <u>Representations in MBSI's March 26, 2010 letter</u>

Resolution of what the Danos counterclaim alleges is important in that it bears on the issue of whether the contracting officer relied on a false statement made by MBSI.  In a letter dated March 17, 2010, to MBSI, the contracting officer initially invited MBSI to provide her with evidence that both MBL and MBSI had "'a satisfactory record of integrity and business ethics'" as defined in FAR 9.104-1(d), in light of the SFO's prosecution and "investigations undertaken concerning similar matters."  AR at 575-76 (quoting FAR 9.104-1(d)).  The contracting officer suggested that MBSI "take care to ensure [its] response [was] truly adequate to support a positive conclusion," including, for example, "corrective action plans." <u>Id.</u>

This letter reveals that the M&J fraud litigation was of serious concern to the contracting officer.  Because "[a]ffiliated concerns . . . are normally considered separate entities," FAR 9.104-3(c), the contracting officer sought to understand not only the level of corrective action that M&J, later MBL, had taken, but how the actions of MBSI's affiliates could affect the MBSI responsibility determination.  Put another way, how closely connected are the affiliated entities, and how closely connected was MBSI to the M&J fraud?  The precise scope of the contracting officer's inquiry is significant: she requested evidence supporting a responsibility determination in light of "investigations undertaken concerning similar matters" to the SFO prosecution.  AR at 576.  She expressly alerted MBSI of her concern with behavior beyond the activities that the SFO had prosecuted.  At the same time, the contracting officer also indicated that she would place weight on any "corrective action plans" taken by MBSI and MBL.  <u>Id.</u>

The parties' divergent views of whether this letter is a misstatement stem from MBSI's precise wordsmithing and the contracting officer's use of narrower language.  In response to the contracting officer's March 17, 2010 inquiry, MBSI stated that "[i]t is important to note that MBSI was never party to, and has never been alleged to have been a party to, the practices for which M&J has been prosecuted."  AR at 582.  While plaintiff contends that "based on the Danos counterclaim, that statement is undeniably false," Pl.'s Br. filed Oct. 29, 2010, at 13, MBSI claims that it "told the truth.  The SFO did not allege any bribery scheme on the Dominican Republic project, much less assert MBSI's complicity in such a scheme."  MBSI's Br. filed Nov. 12, 2010, at 31.

Lining up MBSI's statement—MBSI was never "<u>alleged</u> to have been a party to, <u>the practices for which M&J has been prosecuted</u>," AR at 582 (emphasis added)—against the Danos counterclaim indicates that MBSI's statement was inaccurate.  The Danos counterclaim alleges that MBSI was involved in an attempted fraud scheme, whereby

exorbitant commissions of twenty percent were paid outright by M&J until MBSI attempted to initiate a structure to split the commission into a commission and service agreement in order to conceal the high commission payment. The Danos counterclaim describes how this similar "practice" took place in conjunction with the Jamaican commission payments, for which the SFO prosecuted M&J. Compare AR at 3623 (Danos counterclaim, recounting Mr. Forsyth's orders to re-label the commission payments to Jamaican officials as both commission and service agreements), with AR at 3642 (Danos counterclaim, alleging that Mr. Pagan had never preformed "services" in connection with his commission payments in the first five Dominican Republic transactions); see also AR at 3414 (Prosecution Opening Note, stating that M&J paid Jamaican agent twelve and one-half percent of contract price; and further that "it is accepted by M&J that [the agent] was involved in corrupt activity"); AR at 3442 (Prosecution Opening Note, explaining that there was a "practice of corrupt activity within [M&J]" that was historically "pervasive" (emphasis added)).

MBSI's additional statement that "no allegations have been made which would suggest that any of Mr. Forsyth's activities at M&J affected MBSI," may contribute to the confusion. AR at 583. What MBSI may have meant by "affected" is unclear. What is clear is that the Danos counterclaim alleges that Mr. Forsyth, along with M&J, was involved in negotiating a deal with Dominican Republic representative Mr. Pagan for which Mr. Pagan was to be paid through commission and service agreements executed by MBSI and with input from MBSI director Mr. Booth. AR at 3640. Mr. Danos implies that the service agreements were designed to shield the participants from suspicion by the Ex-Im Bank, that the agents for the contracts were involved in bribery, and that they in no way reflected an actual exchange of services. AR at 3636 ("Mr. Pagan did not wish to be remunerated by reference to 'services' when both he an Mabey knew that he was not providing any 'services' over and above finding and securing contracts as he had done for the past 15 or so years."); AR at 3642 (alleging that there were no services provided in first five contracts). Regardless of whether MBSI actually closed the deal or not, the Danos counterclaim contains an allegation that Mr. Forsyth's actions at M&J, similar actions Mr. Danos alleges were employed in Jamaica, affected MBSI.

### 3) Reliance by the contracting officer on the inaccurate statements

Reliance on a misrepresentation is of critical importance because "[i]t is well-established that a contracting officer should consider disqualifying a proposed contractor if a material misrepresentation is made." Domenico Garufi, 238 F.3d at 1339. The Federal Circuit favorably cited two Comptroller General decisions that offer guidance as to what it means for a misrepresentation to be material. Tucson Mobilephone, Inc., B-258408, 1995 WL 335101 (Comp. Gen. June 5, 1995), tied materiality into a contracting officer's reliance on a misrepresentation, stating that "[a] misrepresentation is material where an agency has

19

relied upon the misrepresentation and that misrepresentation likely had a significant impact upon the determination." Id. at *6.  Similarly, Ppathi, Inc., B-249182, 1993 WL 25128 (Comp. Gen. Jan. 26, 1993), articulated the standard by which a contracting officer can cancel an awarded contract, as follows:  "When a contracting official discovers an impropriety . . . the official may terminate the contract . . . .  The contracting official need only show that the impropriety 'might have affected the award decision.'" Id. at *3 (citation omitted).  Both decisions underscore the contracting officer's reliance on the misstatement in making her responsibility determination, as do the facts of Domenico Garufi.

The contracting officer in Domenico Garufi rated a potential contractor responsible even though the contractor's principal was found by an Italian court in 1997 to have been "involved in intimidating a competitor into withdrawing from a bid." 238 F.3d at 1328.  The individual convicted, Carmelo La Mastra, controlled two companies that, in turn, along with a company controlled by Mr. La Mastra's brother, comprised the ownership of the awardee, a joint venture. Id. at 1327-28.  Following Mr. La Mastra's conviction, all three companies were put into a receivership to be run by a legal administrator. Id. at 1328.  When the awardee joint venture bid on a proposal in 1998, it certified that neither it nor its principals had been convicted or had a civil judgment levied against them for the "commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public . . . contract." Id. at 1329 (internal quotation marks omitted).  The plaintiff challenged the responsibility determination as arbitrary and capricious based on the joint venture's failure to report the 1997 receivership proceeding and another indictment of Mr. La Mastra. See id. at 1339.  Because "the record [did] not include any articulation of what the contracting officer concluded when he reviewed the certification," the court concluded that "we must require an explanation by deposition of the contracting officer's reasons for accepting the certification," id. at 1340, and questioned in particular, "whether the contracting officer, as required by [FAR 9.105-1(a)], possessed or obtained information sufficient to decide the integrity and business ethics issue, including the issue of control, before making a  determination of responsibility," id. at 1339.

On remand, the Court of Federal Claims determined that, while the contracting officer generally knew about the receivership proceeding and that the awardee was controlled by a receivership, Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 421, 427 (2002) ("Domenico Garufi II"), he had not read the agreement and did not know that it failed to bar Mr. La Mastra from acting on behalf of the awardee, id. at 426.  He did not know that Mr. La Mastra controlled two of the companies in the joint venture, or that these two companies gave signatory authority to his son. Id. at 425.  The contracting officer admitted that "having knowledge that Carmelo La Mastra was a company principal 'would certainly have [had] a major bearing on what [he] would do.'" Id. at 426 (alteration in original).  Accordingly, the court responded that, "[b]ecause he lacked sufficient information

to be in a position to make the assumptions that he did and because he failed to make an affirmative assessment of [the awardee's] responsibility, the court cannot find that the contracting officer conducted a reasonable responsibility determination." Id. at 428.

Reliance can be argued as important in refocusing on the basic task before the court: was the contracting officer's responsibility determination arbitrary and capricious, i.e., was it rational? Inaccurate statements themselves—that are not relied upon by the contracting officer—logically cannot cause the determination to be irrational. Furthermore, the parties have not argued any Federal Circuit precedent that a contracting officer is obligated to render the potential contractor non-responsible for a misstatement.

In comparing the decisional law to the instant case, and in examining the contracting officer's Memorandum for Record that details the rationale supporting her responsibility determination, the court finds that the contracting officer did not rely on MBSI's inaccurate statements. Although the contracting officer received a non-responsive answer to her initially broad inquiry, she narrowed the scope of her concern in her Memorandum for Record, stating that "a key point[] from the response [from MBSI] that [she] received was that MBSI was never a party to and has never been alleged to be a party to the <u>events that led to the prosecution of M&J</u>," AR at 546 (emphasis added), not just the broadly termed "practices for which M&J has been prosecuted" as articulated in MBSI's response, AR at 582. In this way, the contracting officer made clear that she was basing her assessment on the fact that MBSI was not alleged to be party to the specific events in Jamaica and Ghana that led to M&J's prosecution, not "practices" that led to the prosecution. Nothing in the record contradicts the accuracy of this statement, and the court must accept it at face value. MBSI was not involved in the specific events that led to the SFO prosecution.

The court finds further evidence that the contracting officer narrowed her scope of concern in the introductory language in her Memorandum for Record that she uses to describe her research. The contracting officer stated that her "extensive internet research did not identify any incidents, other than [M&J's sentence in the UK for corrupt practices and for breaching the UN embargo] that [she] needed to consider. Based on having knowledge of these matters," she issued her March 17, 2010 request for information. AR at 545. In this way, the contracting officer limits her concern to the events surrounding the SFO's prosecution of M&J, and not the broader inquiry into "investigations undertaken concerning similar matters" that she requested on March 17, 2010. See AR at 576.

The shift in the contracting officer's concern is pivotal in that it signals to the court a departure from MBSI's inaccurate statements. The court is bound to construe the language used in the contracting officer's Memorandum for Record, not inaccurate statements made to her, in determining what the contracting officer relied on, and these statements consistently

limit her concern to the events for which the SFO prosecuted M&J, not the more general "practices" that led to the prosecution. Therefore, the misrepresentation cannot be said to be material to her analysis, and it does not render her decision arbitrary and capricious.

### 6.  The contracting officer was not required to consider the Danos counterclaim

Plaintiff argues that the contracting officer failed to provide a complete review, contending that her "extensive internet search" failed to uncover a "wealth of [] information" (including the Danos counterclaim) that would have led her to discover a "broader scope of corruption." Pl.'s Br. filed Nov. 29, 2010, at 12.  With regard to specific documents, plaintiff posits that the contracting officer could have obtained the Danos counterclaim and the SFO Prosecution Opening Note because they were "readily available through a simple internet search."  Pl.'s Br. filed Oct. 29, 2010, at 12.  Plaintiff further charges the contracting officer with the information contained in the Danos counterclaim because plaintiff allegedly gave it to the contracting officer's colleague and fellow member of the Technical Evaluation Panel David W. Marck, Product Manager Bridging, U.S. Army.  Id.  Plaintiff cites OSG Product Tankers LLC v. United States, 82 Fed. Cl. 570, 577-84 (2008); Domenico Garufi II, 52 Fed. Cl. at 424-25; Watts-Healy Tibbits, A JV v. United States, 82 Fed. Cl. 614, 618 ("Watts-Healy I") (order entering preliminary injunction), modified, 82 Fed. Cl. 603 (2008); and Southwestern Bell Telephone Co., B-292476, 2003 WL 22380947 (Comp. Gen. Oct. 1, 2003), for the proposition that the "failure to verify information and the failure to investigate representations of the subject of the responsibility determination result[] in an unreasonable responsibility determination."  Pl.'s Br. filed Oct. 29, 2010, at 24.  Plaintiff's statement misinterprets the above cited case law, and each of these cases is distinguishable from the instant matter.

The decisional law, both in the Court of Federal Claims and from the GAO, articulates a standard by which the contracting officer must be informed about the matters on which she bases her decision.  In Domenico Garufi II, the court held the contracting officer's lack of knowledge as to what rights were granted in a receivership agreement was a dispositive factor showing arbitrariness and capriciousness.  52 Fed. Cl. at 427.  This factor was important because the contracting officer did not know who controlled the company, and the contracting officer admitted that "having knowledge that Carmelo La Mastra was a company principal 'would certainly have [had] a major bearing on what [he] would do.'"  Id. at 426 (alteration in original).  The court's ruling was based on the contracting officer's insufficient information that led to faulty assumptions that could not support a reasonable responsibility determination.  Id. at 428.

Similarly, in Southwestern Bell the Comptroller General sustained a protest where the contracting officer had not evaluated the awardee's record of integrity.  See 2003 WL

22380947, at *4, *8.  The contracting officer in <u>Southwestern Bell</u> failed to take into consideration the fact that the principals of the awardee were charged by the Securities & Exchange Commission (the "SEC") with fraud, <u>id.</u> at *4, and even though the awardee was spun off from its original parent company (which had been charged by the SEC), the charged family, or entities controlled by the charged family, remained the majority shareholders. <u>Id.</u> at *3.  Although the contracting officer generally was aware of the allegations about the former parent company and principals, he did not understand that the principals still possessed control over the awardee. <u>Id.</u> at *7.  The contracting officer, moreover, failed to include any documents in his contract file that would support a responsibility determination. <u>Id.</u>; <u>see also</u> <u>id.</u> at *6 ("Although the contracting officer is not required to explain the basis for his or her responsibility determination, '[d]ocuments and reports supporting a determination of responsibility or nonresponsibility . . . must be included in the contract file.'" (alterations in original) (quoting FAR 9.105-2(b))).  Finally, the awardee falsely certified that none of its principals had been indicted within the last three years, a common factual thread through all of the cases cited by plaintiff and a distinguishing factor in the instant matter.  <u>See</u> <u>id.</u> at *8.  Because it was not clear whether the awardee intended to misrepresent itself or even what impact the false certification had on the award, the GAO recommended that the Government reconsider the decision.  <u>Id.</u>

In <u>Watts Healy I</u>, the awardee violated FAR 52.209-5 by failing to state that it had violated Japanese bid rigging law.  82 Fed. Cl. at 616, 618.  The contracting officer determined that, "because bid rigging is common in Japan, it does not rise to a level serious enough to render the corporation not responsible." <u>Id.</u> at 618.  Uncomfortable with the contracting officer's flippant response to a violation of a law, the court entered a preliminary injunction and provided the agency with an opportunity to make a new responsibility determination. <u>Id.</u> at 619; <u>see also</u> <u>Watts-Healy Tibbitts A JV v. United States</u>, 84 Fed. Cl. 253, 253 (2008) ("<u>Watts-Healy II</u>") (holding second responsibility determination was rational and characterizing the contracting officer's initial review as "the most cursory consideration" for "very serious charges").  In upholding the second responsibility determination, the court noted that "[a]lthough the Court might not agree with the [Government's] decision . . . it may not 'substitute its judgment for that of the agency.'" <u>Id.</u> at 258 (quoting <u>Volpe</u>, 401 U.S. at 416).  So long as the Government has not violated the law, all that is required is that the contracting officer articulate a rational basis.  <u>See</u> <u>id.</u>

Plaintiff's assertion that the contracting officer failed to consider the "broader scope of corruption," Pl.'s Br. filed Nov. 29, 2010, at 12, is undermined by the contracting officer's review of the SFO's Prosecution Opening Note.  The administrative record shows that the contracting officer included an article that linked to both SFO Prosecution Opening Notes in her contracting file.  <u>See</u> AR at 778.  Defendant not only persuasively contends that she reviewed these documents before writing her Memorandum for Record, but defendant-

intervenor reviewed during argument the contracting officer's highlighted copy of the SFO Opening Notes.  See Def.'s Br. filed Dec. 3, 2010, at 7.  The court makes the modest inference that, if the contracting officer included an article in her file (a file containing what she considered in making her determination) that contained PDF links to both SFO Prosecution Opening Notes, the contracting officer reviewed these documents.  Her inclusion of the SFO Prosecution Opening Note is a materially distinguishing factor from the Southwestern Bell decision in that she included in her contracting file documents to support her ultimate determination.

The SFO Prosecution Opening Note characterizes M&J as involved in "widespread historical corrupt[ion]."  AR at 3412.  M&J accepted that, "in paying agents large commissions there was a risk that unknown proportions of those payments might be passed on to public servants as bribes," and the SFO opined that, "in countries with a similar risk of corruption where M&J operated, such a system must have given rise to an identical risk." AR at 3406.  The prosecution concluded that "there was a practice of corrupt activity within [M&J] before 2002" that was historically "pervasive."  AR at 3442.  The SFO Prosecution Opening Note suggested that some of the corrupt practices were not being prosecuted, see id., because of the SFO's desire to encourage companies to self-report, see AR at 3407-08.

From the SFO Prosecution Opening Note, the contracting officer was aware of M&J's ownership structure—M&J was an affiliate of a group of companies owned by the Mabey family.  AR at 3410.  Although David Mabey resigned as a director of M&J and Mabey Holdings Ltd. and he no longer has an executive role, "[t]he reality of the ownership structure of M&J is that the Mabey family in general, and David Mabey in particular, have at all times been in exclusive control of the affairs of M&J."  AR at 3411.

The contracting officer was also aware of the remedial steps taken by M&J, as later confirmed by MBL's March 26, 2010 response to her inquiry.  She learned that M&J had replaced its board of directors, and, according to the SFO's assessment "is, to a notable extent, no longer the company that committed these crimes."  AR at 3407; see also AR at 3410 ("The SFO also [recognizes] that since the commencement of the investigation[,] M&J has taken certain remediation steps.").  M&J "introduced new ethical procedures and agreed to the appointment of an external monitor."  AR at 3410.

Plaintiff's contention that the contracting officer should have been required to review the Danos counterclaim is unfounded in law and would have added nothing to the factual basis upon which the contracting officer made her determination.  Unlike Domenico Garufi II and Southwestern Bell, the contracting officer in the instant case was informed on the matters for which she based her decision.  First, the contracting officer was aware of the Danos counterclaim, and either chose not to review it or determined that she need not

24

consider it in coming to her responsibility determination. <u>See</u> AR at 546 (explaining that M&J's internal investigation was undertaken as a result of "an allegation made by an ex-employee that the company had made corrupt payments"). Under <u>Grimberg</u> it was within the contracting officer's purview to determine "what, and how much, information [she] needs." 185 F.3d at 1303 ("Although FAR 9.105-1(a) does require the contracting officer to have, or to obtain, enough information to make a responsibility determination, the contracting officer is the arbiter of what, and how much, information he needs."); <u>see also</u> <u>id.</u> ("[A]lthough the contracting officer is given the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so."). Comparing the <u>Domenico Garufi</u> cases with this well-articulated standard in <u>Grimberg</u>, the case law instructs that the contracting officer's decision not to review the Danos counterclaim should be found unreasonable only if her rationale was based on unfounded assumptions that the Danos counterclaim could have debunked. <u>See Domenico Garufi</u>, 238 F.3d at 1339-41 (questioning what contracting officer concluded in reviewing inaccurate information and remanding bid protest for Court of Federal Claims to determine contracting officer's rationale and basis for concluding awardee responsible); <u>Domenico Garufi II</u>, 52 Fed. Cl. at 426, 428 (finding contracting officer's responsibility determination arbitrary and capricious where it was based on inaccurate assumptions made about a receivership agreement contracting officer did not read).

In the instant matter, the contracting officer made no unfounded assumptions. The contracting officer based her determination, in part, on the fact that "MBSI . . . has never been alleged to be a party to the events that led to the prosecution of M&J," an accurate statement in that MBSI was not alleged to be involved in the corruption in Jamaica and Ghana that led to M&J's prosecution. AR at 546. From the SFO, she was fully aware of the risk that MBSI, by itself or through M&J, had been exposed to the "widespread historical corrupt[ion]," AR at 3412, that was "pervasive," AR at 3442. The contracting officer acknowledged in her Memorandum for Record that M&J "was the manufacturer of the Mabey Logistics Support Bridge," and therefore frequently involved in MBSI's bridge contracts. This relationship was the reason for her inquiry in the first instance.

Her understanding of the scope of corruption is buttressed by allegations contained in the SFO Prosecution Opening Note regarding the extensive control that David Mabey had over the entire Mabey Group of companies, raising the risk that MBSI could have been involved in unprosecuted incidents. The court finds that she was fully aware, with the broad base of corruption and risks, that MBSI may have been involved in this corruption. Whether MBSI was or was not involved in M&J's activities, the contracting officer narrowed her scope of concern to those events that led to actual prosecution and guilty pleas, and the law places this discretionary determination within her authority. Given the allegations contained

in the SFO Prosecution Opening Note, the text of the Danos counterclaim itself was extraneous.

Nor does the court find that the contracting officer's self-denominated "extensive internet search" should have unearthed the counterclaim. The court is loath to impose on a contracting officer the duty to uncover information that could be retrieved in consulting the internet, see Totolo/King, Joint Venture v. United States, 89 Fed. Cl. 442, 445-46 (2009) (discussing issues that arise from argument that a contracting officer's internet search was insufficient), appeal docketed, No. 2010-5037 (Fed. Cir. Jan. 7, 2010). Review of a contracting officer's procurement decision should not involve assessing her computer proficiency or calibrating what the sufficiency of a computer search entails. Plaintiff has been allowed to rely on the Danos counterclaim in court to argue that MBSI and MBL were charged with full knowledge of it in responding to the contracting officer's questions. Moreover, plaintiff was entitled to test whether the contracting officer rested her responsibility determination on a misrepresentation of fact. 7/

The contracting officer's responsibility determination did not emphasize the allegations of M&J's criminal acts. Rather, her decision placed more weight on the remedial measures taken by M&J, as evidenced in her catalog of these measures, which provided most of the support for her positive determination. See AR at 546 (reciting how M&J paid reparations, had five directors step down, voluntarily disclosed instances of corrupt payments, and entered into a monitoring agreement). Although MBL no longer will be subject to the monitoring agreement after 2012, during the pendency of the contract, the contracting officer explicitly included this fact as part of her analysis. Her reasoning more closely parallels that of the contracting officer's in Verestar Government Services Group, B-291854.2, 2003 WL 1903356 (Comp. Gen. Apr. 3, 2003), in that the contracting officer considered the allegations of widespread corruption and weighed these concerns against her belief in the company's renascent commitment to reform. See id. at *3-4 ("In sum, the record establishes that the contracting officer had before him the adverse information that [plaintiff] asserts he failed to consider. More important, the record is also clear that the contracting officer specifically considered the significance of this information in conjunction with other

---

7/ In its order initially entered November 5, 2010 (reissued the date of this opinion), the court allowed plaintiff's Exhibits 8, 9, and part of 11 to the complaint to supplement the record. These exhibits discuss the Danos counterclaim and suggest its accessibility to the contracting officer at the time that she was reviewing the issue. Having concluded that the contracting officer did not need to consider the text of the Danos counterclaim, the court similarly does not place any weight on Exhibits 8, 9, and 11 to the complaint.

information that he obtained and which he viewed as ameliorating the concerns and risks that had been raised . . . .").

The court cannot find on the record before the contracting officer that she was unaware of the broad scope of the Mabey Group's corruption or David Mabey's control over the Mabey companies.  While plaintiff would have the court rely on OSG, and the factors relied on by that contracting officer, that case was in a procedurally different posture because the OSG court was upholding a decision of non-responsibility.  See OSG, 82 Fed. Cl. at 577. Unlike the contracting officer in OSG, the contracting officer in the instant matter placed confidence and emphasis on the remedial measures undertaken in an abbreviated period of time.  Cf. id. (explaining that contracting officer found offeror non-responsible and "did not feel that sufficient time had elapsed for the Government to determine the [remedial] measure's effectiveness").  Similar to OSG, the court in the instant case finds that the decision was within her authority and not within the court's authority to overturn.  Id. at 584 ("[The contracting officer] conducted an extensive investigation of the record . . . and used her business judgment to determine that plaintiff was not a responsible contractor.  We do not substitute this court's judgment for that of a contracting officer making determinations of non-responsibility.").  If the contracting officer believes, as did the SFO, that MBL, through M&J, is "no longer the company that committed these crimes" and that MBSI is trustworthy to monitor its affiliate's actions going forward, the court cannot second-guess that decision.  AR at 3407.

7.  Contention that MBSI should have been charged with M&J's conduct

Plaintiff asserts that "the actions of M&J cannot be separated from an analysis of MBSI" and complains that TACOM "minimize[d] the connection between MBSI and its parent organization."  Pl.'s Br. filed Oct. 29, 2010, at 25.  Plaintiff mistakenly refers to M&J as the parent company.  First, plaintiff misstates the nature of the relationship between MBSI and M&J.  According to the administrative record, MBSI is owned by Mabey Bridging (Americas) Ltd., which, in turn, is owned by Mabey Engineering (Holdings) Ltd.  AR at 579. Mabey Holdings is the parent company of the group of Mabey companies, not M&J.  The court points this out not to minimize the relationship between MBSI and MBL/M&J but, rather, to address the factual inaccuracy inhering in plaintiff's contention.  See id. (describing M&J's remaining endeavors as "some residual trade").

Plaintiff's contention moreover, is undermined in fact and law.  If past criminal conduct by an officer automatically does not establish a bidder as non-responsible, Domenico Garufi, 238 F.3d at 1335, past criminal conduct of an affiliate (M&J, and its effective successor MBL) does not automatically establish non-responsibility.  What is required is that the contracting officer "consider the affiliate's past performance and integrity when they may

27

adversely affect the prospective contractor's responsibility." FAR 9.104-3(c). Here, the contracting officer did just that. She stated in her Memorandum for Record that she "considered the integrity and business ethics of M&J in the determination of responsibility of MBSI and MBL." AR at 545. For the reasons stated above, the court finds that the contracting officer made an informed responsibility decision that was not based on faulty assumptions. Her reliance on remedial measures taken was rational and cannot be second-guessed by this court.

8. Plaintiff's "corporate espionage" claim

Plaintiff contends that the contracting officer's responsibility determination was arbitrary and capricious because it failed to consider the MBSI's alleged "corporate espionage" acts. Pl.'s Br. filed Nov. 29, 2010, at 18 ("[H]ad the [contracting officer] considered the corporate espionage allegations at the time she made her responsibility determination, they would certainly merit some inquiry, since they occurred after M&J had announced it had cleaned house, and, would, therefore, indicate a continuing propensity to engage in unethical, if not criminal, conduct."). Specifically, plaintiff alleges that MBSI sent an employee to plaintiff's warehouse when MBSI knew that the Army was conducting tests on plaintiff's bridges and that MBSI chartered a plane to fly over the testing site. Pl.'s Br. filed Oct. 29, 2010, at 8. MBSI's allegations are memorialized in four letters exchanged between plaintiff and MBSI. See AR at 3396-3402.

The court's order on the parties' motions to supplement the administrative record issued separately this date, discusses the *pas de deux* whereby the parties at one point agreed that the contracting officer had considered the letters, recanted, and ended up with defendant relying on the contracting officer's Statement of Facts to the GAO that she considered them and plaintiff's insistence that she did not. Plaintiff contends that the contracting officer's failure to include in her Memorandum for Record that she considered the "corporate espionage" acts casts doubt as to whether she reviewed them. See Pl.'s Br. filed Nov. 29, 2010, at 16-17.

This dispute is not pivotal to the court's analysis. The contracting officer was not required to consider the "corporate espionage" acts or the letters that memorialized the allegations. Her failure to mention the letters that she may or may not have reviewed in the course of making her responsibility determination is of no consequence because she is the "arbiter of what, and how much[] information [she] needs. . . . [A]lthough the contracting officer is given the discretion to seek additional or clarifying responsibility information from a contractor, [she] is not obligated to do so." Grimberg, 185 F.3d at 1303. The contracting officer was not required to review the letters exchanged between plaintiff and MBSI in which plaintiff alleges that MBSI was engaged in "corporate espionage" acts, nor was she required

28

to follow up on information that her office is alleged to have received from plaintiff concerning MBSI's activities during 2009.  Plaintiff has not presented the court with any basis for requiring her to have considered them.

### 9. Other factors necessary for injunctive relief

Plaintiff has not succeeded on the merits.  To complete the record, the court makes summary findings on the remaining three factors required for an award of injunctive relief.

Plaintiff did show irreparable harm.  An action at law only allows recovery of "bid preparation costs in a suit for damages, but not loss of anticipated profits," leaving a bid protestor irreparably harmed.  Essex Electro Eng'rs, Inc. v. United States, 3 Cl. Ct. 277, 287 (1983).  Nonetheless, "the balance of hardships to the respective parties," Centech, 554 F.3d at 1037, would not favor plaintiff, given the significantly lower price offered by MBSI.

Finally, the court must consider whether an injunction would be in the public's interest.  Id.  Section 1491(b)(3) requires the court to "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."  Defendant submits that [deleted] the bridges.  See Declaration of David W. Marck, Nov. 5, 2010, ¶6 ("Marck Decl. I").  Mr. Marck is the cognizant Army official responsible for the LOCB program.  Id. ¶ 1.

Mr. Marck declares that [deleted].  Id. ¶ 2.  The LOCB system sought by the Army under a full-blown Program of Record ("POR") is a "new solution" to the [deleted] "Bailey Bridge," previously employed since WWII.  Id. ¶ 3.  The LOCB currently provided by plaintiff under its contract with TACOM has bridged the historical gap to the new solution, minus the more complete and rigorous testing required for normal material fielding for a POR, as opposed to the Urgent Material Release ("UMR") vehicle used for plaintiff's contract.  Marck Decl. II ¶ 3, ¶ 3 n.2; see also Marck Decl. I ¶3.  Under the POR the Army will use LOCB systems in conjunction with its Multi Role Bridge Companies ("MRBC") unit.  [Deleted].  Marck Decl. I ¶ 6 (emphasis added).  The bridges supplied under plaintiff's current UMR contract [deleted] and "will never be fielded to MRBC units" because of established restrictions due to lack of the full battery of rigorous tests required for a POR.  Id. ¶ 8.  Rather, the bridges for MRBC units will be "standing operational asset[s] of the unit for use and availability with any unit deployment and mission."  Marck Decl. II ¶ 3.

Defendant has not substantiated the exigent national defense interest that would be jeopardized were Mr. Marck's [deleted].  Marck Decl. I ¶ 8.  While the court does not question the Army's assessment of its preparedness, the court is at a loss to appreciate how any equipment procured by the Department of Defense would fall outside the realm of

29

exigent "national defense" concerns based on Mr. Marck's two declarations.  See Marck Decl. II ¶ 3 (characterizing the procurement as "provisioning to MRBC units as a standing operational asset," and not, as plaintiff's current contract calls for, "the purpose of direct use in theater").  Plaintiff would have prevailed on the factor of furthering the public interest by enjoining contract performance had it shown on the merits that the responsibility determination rendered the procurement process unfair.

## CONCLUSION

Accordingly, based on the foregoing:

1.  Plaintiff's motion for judgment on the administrative record is denied, and defendant's and defendant-intervenor's cross-motions for judgment on the administrative record are granted.  The Clerk of the Court shall enter judgment for defendant and defendant-intervenor.

2.  By December 31, 2010, the parties shall identify by brackets any material subject to redaction before the opinion issues for publication.

**IT IS SO ORDERED**.

No costs.

/s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge